**Charles MILLER, Plaintiff,**

**and**

**William George Foote, William McKinley Hines, and Larry D. Jones, Plaintiffs-Intervenors,**

**v.**

**Joseph VITEK, Individually and as Director of the Department of Corrections, Robert Parratt, Individually and as Warden of the Nebraska Penal Complex, Jack Cleavinger, Individually and as Director of the Department of Public Institutions, Klaus Hartmann, M. D., Individually and as Superintendent of the Lincoln Regional Center, Benjamin Coates, Individually and as head of the Security Building, Lincoln Regional Center, Defendants.**

**No. CV75–L–172.**

United States District Court, D. Nebraska.

Sept. 12, 1977.

Thomas A. Wurtz, Lincoln, Neb., for plaintiff and plaintiffs-intervenors.

Mel Kammerlohr, Asst. Atty. Gen., Lincoln, Neb., for defendants.

Before LAY, Circuit Judge, URBOM, Chief Judge, and DENNEY, District Judge.

URBOM, Chief Judge.

Four[1] men who have been transferred involuntarily from the Nebraska Penal and Correctional Complex to the Security Unit of the Lincoln Regional Center because of claimed mental disease or defect challenge the constitutionality of the state statute under which they were transferred.

The action is brought pursuant to 42 U.S.C. § 1983 and jurisdiction is granted by 28 U.S.C. §§ 1343(3) and (4), as well as 28 U.S.C. §§ 2201 and 2202, which authorize declaratory and injunctive relief.

Under attack is § 83–180, R.R.S. Neb. 1943,[2] which provides:

". . . [W]hen a physician or psychologist designated by the [Director of Correctional Services] finds that a person committed to the [Department of Correctional Services] suffers from a mental disease or defect, the chief executive officer may order such person to be segregated from other persons in the facility. If the physician or psychologist is of the opinion that the person cannot be given proper treatment in that facility, the director may arrange for his transfer for examination, study, and treatment to any medical-correctional facility, or to another institution in the Department of Public Institutions where proper treatment is available. A person who is so transferred shall remain subject to the jurisdiction and custody of the Department of Correctional Services and shall be returned to the Department when, prior to the expiration of his sentence, treatment in such facility is no longer necessary."

Much of the evidence was stipulated or otherwise uncontested. Each of the plaintiffs was separately convicted for violations of Nebraska criminal law and sentenced to the Department of Correctional Services to a term of years. Each plaintiff began serving his term in the Nebraska Penal and Correctional Complex, which is within the Department of Correctional Services, but was involuntarily[3] transferred to the Lincoln Regional Center, which is not within the Department of Correctional Services but is within the Department of Public Institutions. Each was transferred without any formal notice or hearing or any safeguard other than determinations by one or more psychiatrists that the prisoner suffered from a mental disease or defect and that he could not be given proper treatment in the Nebraska Penal and Correctional Complex.

Inmates at the Penal Complex are provided access to certain psychiatric care and treatment, but the institution does not have a staff and facilities necessary to provide

1. On August 18, 1976, this action was certified as a class action by Charles Miller on behalf of all persons presently confined in the Lincoln Regional Center, Security Building, who have been transferred there from the Nebraska Penal and Correctional Complex pursuant to §§ 83–179 and 180, and all persons presently confined to the Nebraska Penal and Correctional Complex. Following a hearing, however, the action was decertified. William McKinley Hines, William George Foote, and Larry D. Jones were added as individual plaintiffs-intervenors thereafter on their motions. Hines was returned to the Nebraska Penal and Correctional Complex and has been released on parole. No evidence has been offered to support his claim and the action evidently is no longer being pursued by him, so his claim will be dismissed. Foote and Miller have been returned to the Nebraska Penal and Correctional Complex, but remain subject to the procedures in § 83–180.

2. Mentioned also in the complaint is a challenge to § 83–179, which provides for an evaluation of persons upon initial admission to a state institution, but this statute was not responsible for the transfer of any of the plaintiffs to the Lincoln Regional Center and it need not be dealt with separately in this case.

3. The involuntariness of the transfer of Larry D. Jones is not crystal clear from the evidence, because he was asked by the examining psychiatrist before his transfer whether he wanted to be transferred and he said that he did, but he was offered no procedure by which he could receive independent advice on the subject and he may well not have been competent to exercise a free choice.

**572**

for all mental health needs which may arise. It does have a psychiatric care unit, which can be used as living quarters for inmates whose conditions require that they be separated from the general population, and a hospital, where more closely guarded and segregated conditions may be imposed. Inmates within the psychiatric care unit or the prison hospital are subjected to a schedule more restrictive than that of the general prison population, but are not required to undergo psychiatric treatment involuntarily.

The Security Unit of the Lincoln Regional Center is a hospital owned and operated by the State of Nebraska for the purpose of treatment of emotional and mental disorders. Patients there, including inmates transferred from the Penal Complex, are frequently required to participate in behavior modification programs and to take whatever medication may be prescribed for them. Confinement conditions are substantially more restrictive than those at the Penal Complex in that the patients have less freedom of movement, are under constant supervision, have substantially fewer recreational and vocational opportunities, are unable to earn money, and must spend most of their time in their wards. When the Lincoln Regional Center determines that an inmate no longer needs to remain at the Lincoln Regional Center, arrangements are made to return the prisoner to the Penal Complex.

### I.

■ The Fourteenth Amendment to the Constitution of the United States forbids any State to "deprive any person of . . . liberty . . . without due process of law". When a person already has lost much of his liberty because he is imprisoned, not every change of status

while he is imprisoned amounts to a loss of "liberty" within the meaning of the Constitution. The opinions in *Meachum v. Fano*, 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976), and *Montayne v. Haymes*, 427 U.S. 236, 96 S.Ct. 2543, 49 L.Ed.2d 466 (1976), are to the effect that it is not merely the gravity of the disadvantage imposed upon the prisoner by changes of location that determines whether the liberty interest is entitled to the protection of due process. The court in *Montayne* said at page 242, 96 S.Ct. at page 2547:

> "We held in *Meachum v. Fano* that no Due Process Clause liberty interest of a duly convicted prison inmate is infringed when he is transferred from one prison to another within the State, whether with or without a hearing, absent some right or justifiable expectation rooted in state law that he will not be transferred except for misbehavior or upon the occurrence of other specified events."

■ The plaintiffs here were not transferred from one "prison" to another but from a prison to a state mental hospital for both a continuation of their prison terms and for mental treatment. The prison and the hospital properly may be equated for due process purposes.[4] The evidence shows that transfers to the Lincoln Regional Center are conditioned upon a finding that the prisoner suffers from a mental disease or defect and cannot be adequately treated within the Penal Complex. The statute under which the plaintiffs' transfers were made specifically so states. Furthermore, the evidence shows that transfers to the Lincoln Regional Center are so conditioned in practice. Inmates are not assigned to the Lincoln Regional Center for any administrative or correctional purposes. Therefore, there was an objective expectation, firmly fixed in state law and official Penal

---

4. Section 83–176, R.R.S. Neb., declares that whenever any person is sentenced or committed under any provision of law to a specific facility within the Department of Correctional Services, "he shall be deemed to be sentenced or committed to the department." The Director of Correctional Services, according to the statute, is authorized to designate as the place of confinement of any person committed to the department "any available, suitable and appropriate residence facility or institution, whether or not operated by the state, and may at any time transfer such person from one place of confinement to another", with some declared restrictions as to minors.

Complex practice, that a transfer would not occur except when the inmate suffers from a mental disease or defect and that it cannot be adequately treated at the Penal Complex. This case, therefore, comes within the exception noted in *Meachum*. Furthermore, the fact of greater limitations on freedom of action at the Lincoln Regional Center, the fact that a transfer to the Lincoln Regional Center has some stigmatizing consequences, and the fact that additional mandatory behavior modification systems are used at the Lincoln Regional Center combine to make the transfer a "major change in the conditions of confinement"[5] amounting to a "grievous loss"[6] to the inmate. We therefore hold that due process attached to the plaintiffs' liberty interest, and the task of the court is to determine what process is due and whether the procedures provided to these plaintiffs were adequate. See *Morrissey v. Brewer*, 408 U.S. 471, 484, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972).

## II.

Because due process is a flexible concept to be fitted to each setting, some analytical framework is helpful in deciding the specific steps that fit a specific setting. *Mathews v. Eldridge*, 424 U.S. 319, 334–355, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976), suggests ". . . [O]ur prior decisions indicate that identification of the specific dictates of due process generally requires consideration of three distinct factors: first, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. See, *e. g.*, *Goldberg v. Kelly, supra*, [397 U.S. 254] at 263–271 [, 90 S.Ct. [1011] at 1018–1022, 25 L.Ed.2d 287]."

As to the first factor, the private interest in this case is the plaintiffs' interest in avoiding the entry of a more controlled confinement and being labeled mentally ill. Because the plaintiffs have already been deprived of much of their freedom of choice, this private interest is not identical to the interest of nonprisoners who are being considered for civil commitment, as in *Doremus v. Farrell*, 407 F.Supp. 509 (U.S.D.C. Neb.1975). Entry into a mental hospital still carries some distinctive stigma, which in the specific setting of this case is accompanied by techniques of behavior modification[7] not used at the Penal Complex, so the interest of the plaintiffs is not the same[8] as that of other prisoners who are being considered for transfer from one prison to another, as in *Meachum, supra,* and *Montayne, supra,* or that of other prisoners who are being taken through prison disciplinary proceedings, as in *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974).

Second, the risk of an erroneous deprivation of these private interests is relatively high where the only safeguard used is the opinion of one physician or psychologist without opportunity for anyone—the prisoner or anyone on his behalf—to question that opinion. This is especially true because the inmate may be mentally unable to

---

5. See *Wolff v. McDonnell*, 418 U.S. 539, 571–572, n. 19, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974).

6. *Morrissey v. Brewer*, 408 U.S. 471, 482, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972).

7. The evidence before us would not support a statement like that made in *United States ex rel. Schuster v. Herold*, 410 F.2d 1071, 1078 (C.A. 2nd Cir. 1969):

     ". . . Yet he [the transferred prisoner] will be confined with men who are not only mad but dangerously so. . . . [H]e will be exposed to physical, emotional and general mental agony. Confined with those who are insane, told repeatedly that he too is insane and indeed treated as insane, it does not take much for a man to question his own sanity and in the end to succumb to some mental aberration."

8. These techniques were only generally described at the trial, but appear to include medication.

understand or to challenge the conclusions. Other procedural safeguards, such as written prior notice, a hearing, written findings, and someone to speak for the one claimed to be mentally ill, have self-evident value in reducing the risk.

Third, the state's interest in placing a mentally ill person into the institution best equipped to treat him is strong and deserves primacy. Swiftness does not appear to be a major need, in view of the availability at the Penal Complex of physical security, some psychiatric and psychological staff, and a hospital. Hazards of calling witnesses at a hearing, either within or outside the Penal Complex, whether those witnesses are prisoners or nonprisoners, are certainly less when the issue is whether the inmate is mentally ill than when the issue is whether the inmate has committed some infraction for which he should be disciplined.[9] Usually, the witnesses in a mental hearing will be nonprisoners.

In *Morrissey v. Brewer*, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972), the court listed six procedural safeguards as minimal requirements of due process where the issue was what process is due a parolee on revocation of his conditional liberty:

1. Written notice of the claimed violations of parole;

2. Disclosure at a hearing of the evidence in support of the state's claim;

3. An opportunity to be heard in person and to present witnesses and documentary evidence;

4. The right to confront and cross-examine witnesses (unless the hearing officer specifically found good cause for not allowing confrontation);

5. A hearing before a neutral and detached hearing body, members of which do not need to be judicial officers; and

6. A written statement by the decisionmaker as to the evidence relied upon and the reasons for any adverse decision.

Each of these, and others, will be discussed in terms of a proceeding to determine whether a prisoner should be transferred to a mental hospital.

■ Formal notice that transfer to a mental hospital is being considered, disclosure to the prisoner of the evidence being relied upon for the transfer, and an opportunity to be heard in person and to present documentary evidence are so fundamental that little discussion of them is needed. See *In re Gault*, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967). We perceive no consideration that militates against requiring those basic and vital procedures.

Calling of witnesses by the defense and confronting of all witnesses called by the state stand on a somewhat different footing. It cannot be denied that friction between prisoners arising in or because of a hearing at which prisoners testify against prisoners is a relevant factor, at least when the hearing is within the prison, but the nature of the inquiry in a mental hearing holds a sufficiently low possibility of friction that it appears to us there is a right to call witnesses and to confront and cross-examine witnesses, except upon a finding, not arbitrarily made, of good cause for not permitting each as to a particular witness.

A neutral and detached hearing body is essential. While a judicial officer is not required, and the decisionmaker need not be from outside the prison or hospital administration,[10] at least the examining or treating physician or psychologist should not be permitted to vote on the commitment decision.[11] A written statement by the factfinding body as to the evidence relied upon and the reasons for transferring the inmate should be made. We see no relevant fac-

---

9. For a discussion of the hazards related to disciplinary hearings, see *Wolff v. McDonnell*, 418 U.S. at 566–569, 94 S.Ct. 2963.

10. See *Withrow v. Larkin*, 421 U.S. 35, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975); *Hortonville Joint School District v. Hortonville Education Association*, 426 U.S. 482, 96 S.Ct. 2308, 49 L.Ed.2d 1 (1976); *Wolff v. McDonnell*, 418 U.S. at 570–571, 94 S.Ct. 2963 (1974).

11. See *Doremus v. Farrell*, 407 F.Supp. 509, 517 (U.S.D.C. Neb.1975), and cases cited there.

tors different from those noted by the court in *Wolff v. McDonnell*, 418 U.S. at 565, 94 S.Ct. 2963.

The availability of counsel is as critical to a prisoner who may be mentally ill as it is to a nonprisoner in the same condition. The capability to examine, understand, evaluate and challenge the process and the evidence is vital and there may be nobody available to do so, unless it be by counsel, furnished by the state, if need be, because of indigency. The state's interest in avoiding hearings having an adversary cast which may tend to obstruct achievement of correctional goals, recognized in *Wolff v. McDonnell*, 418 U.S. at 569–570, 94 S.Ct. 2963, are overshadowed by the disability which accompanies one who is mentally ill.

It should be apparent that the prisoner's rights are largely illusionary unless he knows those rights. The procedure, therefore, should assure notice of them to him.

Accordingly, § 83–180(1), R.R.S. Neb. 1943, is unconstitutional as applied to the plaintiffs, because none of the foregoing rights was afforded the plaintiffs.

To recapitulate, the minimal requirements of due process when a person is transferred from the Nebraska Penal and Correctional Complex to the Lincoln Regional Center are these:

  A. Written notice to the prisoner that a transfer to a mental hospital is being considered;

  B. A hearing, sufficiently after the notice to permit the prisoner to prepare, at which disclosure to the prisoner is made of the evidence being relied upon for the transfer and at which an opportunity to be heard in person and to present documentary evidence is given;

  C. An opportunity at the hearing to present testimony of witnesses by the defense and to confront and cross-examine witnesses called by the state, except upon a finding, not arbitrarily made, of good cause for not permitting such presentation, confrontation, or cross-examination;

  D. An independent decisionmaker;

  E. A written statement by the factfinder as to the evidence relied on and the reasons for transferring the inmate;

  F. Availability of legal counsel, furnished by the state, if the inmate is financially unable to furnish his own; and

  G. Effective and timely notice of all the foregoing rights.

This opinion does not seek to determine whether there are other procedures that would be useful or the best way to implement the constitutional demands. Those are matters for the legislative process and not for the courts.

### III.

■ Persuaded as we are that § 83–180(1) is unconstitutional as applied to these plaintiffs because of due process infirmities, we resolve the action on that basis. A prime obstacle to resolving the case on equal protection grounds, as was done in *Baxstrom v. Herold*, 383 U.S. 107, 86 S.Ct. 760, 15 L.Ed.2d 620 (1966), is that an equal protection analysis requires a comparison of the § 83–180(1) procedure with a more favorable procedure afforded persons not in the class described in § 83–180(1). At the time the plaintiffs were transferred to the Lincoln Regional Center, the procedure used for committing nonprisoners to mental hospitals was constitutionally defective. It was so declared in *Doremus v. Farrell*, supra, as failing to provide due process. That procedure, therefore, is a poor standard for comparison purposes. The present procedure for civil commitments, found in § 83–1001 et seq., became effective on April 6, 1976, which was after the plaintiffs were transferred to the Lincoln Regional Center. We do not mean to say that an equal protection analysis could not be made; we mean only that hurdles exist which need not be cleared. Even under an equal protection analysis, the ultimate question of the propriety of differentiating procedures for prisoners and nonprisoners probably depends upon a weighing of the factors dis-

cussed in this opinion regarding due process. Whether the Nebraska legislature ultimately decides to use a procedure for transferring prisoners to a mental hospital that differs from that for committing nonprisoners must be left to the good judgment of the legislature, limited only by constitutional strictures.

### IV.

The precise relief to be ordered for the individual plaintiffs should be fashioned after suggestions from counsel. The order which is filed at the time of this memorandum will require the making of specific proposals.

The foregoing memorandum of decision constitutes the findings of fact and conclusions of law required by Rule 52 of the Federal Rules of Civil Procedure.