Raul MEZA, Plaintiff,

v.

Brad LIVINGSTON, Executive Director of the Texas Department of Criminal Justice, in his Official Capacity; Stuart Jenkins,[1] Director of the Texas Department of Criminal Justice Parole Division, in his Official Capacity; and Rissie L. Owens, Jose Aliseda, Charles Aycock, Conrith Davis, Jackie DeNoyelles, Barbara Lorraine,[2] and Juanita M. Gonzales, in their Official Capacities as Members of the Texas Board of Pardons and Paroles, Defendants.

Cause No. A–05–CA–1008–LY.

United States District Court, W.D. Texas, Austin Division.

March 24, 2009.

---

**1.** Meza originally sued Bryan Collier, the former Director of the Texas Department of Criminal Justice Parole Division. The Court granted Defendants Brad Livingston and Collier's motion to substitute Stuart Jenkins for Collier on November 10, 2008 (Clerk's Document 334).

**2.** Meza originally sued Linda Garcia, in her official capacity as a member of the Texas Board of Pardons and Paroles. The Court granted the Board members' motion to substitute Barbara Lorraine for Garcia on November 10, 2008 (Clerk's Document 334).

James C. Harrington, Scott Medlock, Texas Civil Rights Project, Austin, TX, for Plaintiff.

Jennifer Kraber, Travis County Attorney's Office, Anthony G. Brocato, Jr., M. Carol Gardner, Assistant Attorney General, Celamaine Cunniff, Demetri Anastasiadis, Bruce R. Garcia, Office of the Attorney General, State of Texas, Law Enforcement Defense Division, Austin, TX, for Defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

LEE YEAKEL, District Judge.

BE IT REMEMBERED that on November 10, 2008, the Court called the above-styled cause for bench trial, which after several recesses, concluded December 9, 2008. Plaintiff Raul Meza appeared in person and by counsel. Defendants Brad Livingston, as Executive Director of the Texas Department of Criminal Justice, and Stuart Jenkins, as Director of the Texas Department of Criminal Justice— Parole Division (collectively, the "Department") appeared by counsel. Defendants Rissie L. Owens, Jose Aliseda, Charles Aycock, Conrith Davis, Jackie DeNoyelles, Barbara Lorraine, and Juanita M. Gonzales, as members of the Texas Board of Pardons and Paroles (collectively, the "Board") appeared by counsel. Meza contends, *inter alia,* that Defendants denied him the process he was due when they imposed and enforced sex-offender conditions as part of his mandatory supervision following his term of incarceration in the Texas Department of Criminal Justice— Correctional Institutions Division. Having carefully considered the evidence presented at trial, the parties' stipulated facts, the applicable law, the arguments of counsel, and the record in this cause, the Court finds and concludes that the procedural protections afforded to Meza pursuant to *Coleman v. Dretke* were insufficient, and will grant Meza's request for declaratory and injunctive relief to the extent that the State of Texas must afford Meza due process as required by *Coleman.* *See* 395

F.3d 216 (5th Cir.2004). In so deciding, the Court makes the following findings of fact and conclusions of law.[3]

### Jurisdiction and Venue

The Court has jurisdiction, as Meza's claims arise under the Constitution and laws of the United States. *See* 28 U.S.C. §§ 1331, 1343 (2006). The Court has authority to grant Plaintiffs claims for declaratory and injunctive relief. *See* 28 U.S.C. §§ 2201–2202 (2006); Fed. R. Civ. P. 57, 65. Venue is proper in the United States District Court for the Western District of Texas, Austin Division, because all events and omissions complained of occurred within this district. *See* 28 U.S.C § 1391(b) (2006).

### Background [4]

On March 8, 1982, Meza pleaded guilty under Texas law to the murder of nine-year-old Kendra Page and admitted to sexually assaulting Page during the course of the murder. Meza was sentenced to 30 years imprisonment for the murder. On September 8, 1989, Meza was sentenced to four years additional imprisonment, to be served consecutively to his 30–year term, for possession of a deadly weapon in a penal institution. Meza's sentence currently will expire January 24, 2017.

At the time of Meza's conviction, Texas law provided that a person convicted of a crime *must* be released from prison on mandatory supervision when the length of the prisoner's calendar time in prison plus good-conduct time the prisoner earned while in prison equaled the total length of

---

3. All findings of fact contained herein that are more appropriately considered conclusions of law are to be so deemed. Likewise, any conclusion of law more appropriately considered a finding of fact shall be so deemed.

4. On October 28, 2008, the parties submitted stipulated facts (Clerk's Document 308). The Court incorporates the stipulated facts in this opinion as appropriate. Many of the stipulated facts state that an event occurred "on or about" a certain date. For simplicity, the Court omits "on or about."

the sentence imposed on the prisoner.[5] *See* Act of May 29, 1977, 65th Leg., R.S., ch. 347, § 1, art. 42.12, sec. 15(c), 1965 Tex. Gen. Laws 925, 927–28 (current version at Tex. Govt. Code Ann. §§ 508.147–.149 (West 2004, Supp.2008)). " 'Mandatory supervision'. . . mean[s] the release of a prisoner from imprisonment but not on parole and not from the legal custody of the State, for rehabilitation outside of prison walls under such conditions and provisions for disciplinary supervision as the Board of Pardons and Paroles may determine." *See* Act of May 29, 1977, 65th Leg., R.S., ch. 347, § 1, art. 42.12, sec. 2(d), 1965 Tex. Gen. Laws 925, 926 (current version at Tex. Govt. Code Ann. § 508.001(5)). The purpose of mandatory supervision is "to aid all prisoners to readjust to society upon completion of their period of incarceration. . . ." *See* Act of May 29, 1977, 65th Leg., R.S., ch. 347, § 1, art. 42.12, sec. 1, 1965 Tex. Gen. Laws 925, 925.

The Board has no discretion and must grant mandatory supervision of the type applicable to Meza. *See* Act of May 29, 1977, 65th Leg., R.S., ch. 347, § 1, art. 42.12, sec. 15(c), 1965 Tex. Gen. Laws 925, 927–28; Tex. Govt. Code Ann. § 508.001(5) (West 2004); *Coleman v. Dretke*, 395 F.3d 216, 219 n. 1 (5th Cir.2004). Offenders released on either mandatory supervision or parole are called "releasees." Tex. Govt. Code Ann. § 508.001(9).[6] The Department's Parole Division supervises all parolees.

A panel of the Board sets an offender's conditions of parole. Tex. Govt. Code Ann. § 508.0441. A panel consists of three state officials, including at least one Board member and any combination of Board members and commissioners. *Id.* § 508.045(b). Board members are appointed by the Texas Governor, while commissioners are Board employees. *Id.* §§ 508.031, .040(a)(1). The Department's Parole Division enforces the Board-imposed conditions and supervises parolees. *Id.* § 508.112.[7]

On May 19, 1993, after serving 11 years of his sentence, Meza was released from custody and placed on parole as required by existing law. While on parole, Meza lived a relatively normal life within the community. On August 24, 1994, Meza violated the conditions of his parole by returning to his residence 15 minutes after his state-imposed curfew. The State conducted a revocation hearing on September 16, 1994, revoked Meza's parole on Octo-

**5.** The mandatory-supervision law was amended in 1995 to be discretionary. *See* Act of May 29, 1995, 74th Leg., R.S., § 5, art. 42.18, sec. 2(c–1), 1995 Tex. Gen. Laws 2592, 2592–93 (current version at Tex. Govt. Code Ann. § 508.149(b) (West Supp.2008)).

**6.** In *Coleman v. Dretke*, 395 F.3d 216 (5th Cir.2004), the court of appeals simplified the terms used in the Texas Government Code: "[b]ecause the distinction between mandatory supervision and parole is not highly relevant to the issues at hand we will use the simpler term 'parole' for the remainder of this opinion." *Coleman*, 395 F.3d at 219, n. 1; *see also* Tex. Govt. Code Ann. § 508.147 ("An inmate released to mandatory supervision is considered to be released on parole."). This Court will do the same and also use the more familiar term "parolee" instead of "releasee." *See Coleman*, 395 F.3d at 219, n. 1. As used in this opinion the term "parolee" includes a releasee on either parole or mandatory supervision.

**7.** The Board and Department attempt to distinguish their responsibilities, and indeed, the agencies perform separate functions. However, the Department and the Board are Texas state agencies that work closely together. In the final analysis, Meza's conditions are imposed and implemented by the State of Texas. The Court considers all of Meza's allegations to be against the state. Thus, despite their different responsibilities, the Court will refer throughout this opinion to the Board and the Department as the "State," unless it is important to refer to either specifically.

ber 21, 1994, and incarcerated him again until September 25, 2002.

The State was required to release Meza from prison on September 25, 2002. *See* Act of May 29, 1977, 65th Leg., R.S., ch. 347, § 1, art. 42.12, sec. 15(c), 1965 Tex. Gen. Laws 925, 927–28. The State again set Meza's parole conditions, which are more restrictive than those in 1993 due to changes in state law. Some of Meza's conditions are statutorily required, while some are "special conditions" imposed by the Board. *See* Tex. Govt. Code Ann. §§ 508.181–.191, .221–.226. Meza's current special conditions include the Super Intensive Supervision Program condition ("SISP"); Special Condition O.06, regarding child-safety zones; Special Condition X, containing sex-offender conditions; and Special Condition 0.99, which prohibits Meza from leaving the Travis County Correctional Complex ("TCCC"), where he is housed, without a supervising parole officer.[8] Some of Meza's special conditions contain overlapping components.[9]

Meza's SISP condition includes the requirements that he reside in a community residential facility, or "halfway house," designated by the Department; comply with all facility rules and regulations in effect during his period of residence; attend educational and vocational training classes as directed by his parole officer; not go within 500 feet of places children commonly gather (child-safety-zone component); and wear an electronic-monitoring device at all times.[10] Special Condition X requires that Meza participate in a sex-offender-treatment program, be evaluated to determine the need for sex-offender counseling, enroll and participate in a treatment program for sex offenders as directed by his supervising parole officer, submit to polygraph examinations, avoid child-safety zones, wear an electronic-monitoring device, and otherwise comply with sex-offender conditions.[11] Special Condition O.06 also prohibits Meza from entering child-safety zones.

Immediately upon his release from State custody in 2002, Meza was placed in the physical custody of Travis County, Texas. Since then Meza has resided at TCCC, a Travis County jail facility in Del Valle, Texas, with which the State contracts to house parolees. While Meza is physically housed at TCCC, the Department retains control over his movements. Meza resides

8.  Special Condition 0.99 is a "free text" special condition, meaning a Board panel may use it to impose any type of condition on a parolee. Parolees may have more than one condition 0.99, and very few parolees have a special condition 0.99 like Meza's. Meza is the only parolee at TCCC with the parole-officer-supervision condition. Mike Lozito, Parole Division Region IV Director, testified that one parolee in San Antonio has such a condition.

9.  Board Administrator Troy Fox testified that the Board purposely overlaps certain conditions such as Meza's stand-alone Special Condition 0.99, requiring a parole-officer escort, and SISP, so that there will be a backup in case the State ever withdraws SISP as a condition.

10.  In Meza's November 13, 2003 parole certificate, his SISP condition included a sex-offender-registration component. The certificate also imposed Special Condition M, requiring him to register as a sex offender. However, Meza's July 19, 2005 Notice of Special Conditions omits Special Condition M and other sex-offender-registration components. At trial, State witnesses testified that Meza no longer has sex-offender-registration conditions on his parole.

11.  In Meza's July 19, 2005 Notice of Special Conditions, Special Condition X requires both that Meza "participate in the Sex Offender Treatment Program," and "enroll and participate in a treatment program for sex offenders as directed by the supervising parole officer." The distinction between these components, if there is one, is not clear from the record.

in a bay of TCCC's work-release section with other parolees, surrounded by a razor-wire fence. Meza testified that other bays in the work-release section house prison inmates, he has been in such bays, and they are identical to the bay in which he is housed. Meza must comply with TCCC rules, such as going to bed at 10:30 p.m. and rising at 5:00 a.m. When Meza leaves his residence bay, he must wear a jail uniform. Family may visit once a week, and visits are conducted through a glass partition by telephone. A TCCC resident may have one contact visit each month, at which he may hold hands with his guest. Meza's parole officer provides his daily schedule. When the Department allows Meza to leave the jail, it transports him in a cargo van equipped with an interior steel cage. The State throughout the trial argued Meza's living conditions do not amount to confinement; the Court is unpersuaded.

Meza's parole conditions require that he reside at TCCC for the first 180 days of his parole. To leave TCCC and reside elsewhere, Meza's parole conditions require that he form a viable residence plan. To form a viable residence plan, Meza must demonstrate that he has the income to live elsewhere. To obtain income, he must secure employment. However, the restrictiveness of Meza's parole conditions have prevented him from securing employment. The 180–day initial residency period has long since expired, but Meza remains in TCCC. Theoretically, Meza's conditions do not prevent him from living in the community, attending church, visiting his family, or obtaining employment, but practically, his conditions prohibit him from leaving TCCC, a jail.

Few other parolees have conditions of release as restrictive as Meza's. Meza cannot go within 500 feet of places children commonly gather, including but not limited to, schools, day-care facilities, playgrounds, public or private youth centers, public swimming pools, or video-arcade facilities. Meza's child-safety-zone conditions prevent him from living with his mother, because she occasionally cares for children in her home. Meza's child-safety-zone conditions have also caused the State to prevent Meza from accepting job offers he has received.

Meza's conditions include the highest level of monitoring and supervision and the requirement that he be escorted by a parole officer at all times. Special Condition 0.99, the parole-officer-supervision requirement, is especially restrictive, because the Department controls the availability of parole officers. At trial, State witnesses could identify but one other parolee in Texas with a comparable parole-officer-supervision condition. The Department assigns a parole officer to escort Meza outside TCCC for only eight hours per week. Between 2002 and 2005, Meza was allowed to leave TCCC only twice; once for a job interview and once to visit a hospital emergency room. Meza must present any request to leave TCCC to his parole officer in writing, and currently, the Department grants only his requests to leave for medical reasons.

In 2005, Meza began visiting Project RIO, or "Reintegration of Offenders." At Project RIO, Meza may use computers to search for jobs, make collect calls from telephones, and participate in job-training and placement programs. Meza has also participated in resume-writing classes at Project RIO. Sometimes the Department denies his requests to take such classes. Meza was accepted into the Construction Gateway program at Project RIO, which offers former offenders job-training opportunities. Through Construction Gateway, Meza attended a seven-week construction class at Austin Community College.

The Department provides a parole officer for Meza to attend Project RIO for only four hours per week, two hours each on Wednesday and Friday.[12] Meza testified that attending Project RIO two days per week for two hours per day is insufficient to enable him to obtain employment, because he does not have time to follow up on job leads. He is unable to pursue job leads from the jail, because he has no money with which to make phone calls on the pay telephones, and prospective employers will not accept collect calls from jail.

Sylvester Villarreal, the Program Coordinator at Construction Gateway, testified that for someone in Meza's position to secure employment, seeking employment should be a 40–hour–per–week endeavor. Villarreal stated that, although Meza diligently searches for employment, his conditions have hindered his opportunities. Villarreal explained that jobs are posted on Internet databases early in the week, and the best time for Project RIO attendees to search for employment is Sunday or early in the week. Often jobs have been filled by Wednesday or Thursday. Meza's Department-imposed schedule is problematic for Meza, because the Department only allows him to attend Project Rio on Wednesdays and Fridays. Further, the Department requires that Meza provide his parole officer with information regarding his job leads. He is the only Construction Gateway 'participant who must provide this information. Overall, despite Meza's job-search attempts at Project RIO and participation in the Construction Gateway program, his parole conditions have prevented him from securing employment.

In the years that he has attended Project RIO, Meza has submitted many job prospects to his parole officer for review and approval. Meza's parole officer must communicate up the Department chain of command regarding Meza's opportunities. Usually Meza's parole officer does not inform Meza of the results after inquiring with employers about the possibility of Meza working for them.[13] The record reflects confusion and delays as inquiries regarding Meza's opportunities make their way through the Department. For example, in April 2007, Meza was offered a construction-industry job that required that Meza undergo a urinalysis as part of the hiring process. The Department denied Meza's request to have the urinalysis performed. When Meza's attorney complained, no one responded. Mike Lozito, Parole Division Region IV Director, testified that he did not think the complaint needed a response. He passed it to another state official and was uncertain what subsequently occurred. Despite Lozito's lack of engagement with Meza's job search process, Lozito further testified that he would "love" for Meza to find a job.

Besides the aforementioned construction job, Meza has received three offers of employment since 2002. One required that Meza have a driver's license, but at that time the Department would not allow him to obtain such license.[14] Meza was offered

12. The record reflects that the Department allots a parole-officer to accompany Meza for eight hours per week, but that he may spend only four hours per week at Project RIO. It is unclear what occurs in the remaining four hours. Meza's parole conditions do not limit his time away from TCCC. The conditions do require that he be accompanied by a parole officer when away from TCCC.

13. During Meza's time at TCCC he has had between 12 and 15 parole officers.

14. Lozito testified that he would not allow Meza to obtain a driver's license when Meza requested one, because Lozito did not see a point in Meza's having one. Lozito denied that he imposed such a "condition" on Meza, because he is not authorized to impose condi-

a clerical position on the tenth floor of a downtown building, but the Department would not approve the position because a child-safety zone was located across the street. The last offer was a construction position, but the Department would not approve it, because Meza would have had to cross a child-safety zone to reach the job site.

Meza brought this action on December 5, 2005, alleging violations of his Fourteenth Amendment equal-protection and due-process rights. *See* U.S. Const. amend. XIV, sec. 1. It is undisputed that at all relevant times, Defendants were acting under color of law, pursuant to legal authority, and in their official capacities.

### Fourth Amended Complaint

In his Fourth Amended Complaint, Meza asserts that the Board violated his due-process rights by imposing sex-offender conditions and other irrational, arbitrary, and capricious conditions on his parole. *See* U.S. Const. amend. XIV, sec. 1; Civil Rights Act of 1871, 42 U.S.C. § 1983 (2006). Meza asserts the Department and Board are violating his Fourteenth Amendment due-process rights by imposing conditions on his parole that are qualitatively different from the punishment typically imposed on similarly situated parolees. *See id.* Meza further alleges that the Department is violating his Fourteenth Amendment due-process and equal-protection rights by imposing additional informal, unauthorized conditions on his parole and habitually and intentionally treating Meza differently from similarly situated parolees. *See id.*

Meza seeks an injunction preventing Defendants from imposing sex-offender conditions without due process and from continuing to subject him to qualitatively different conditions of confinement without

due process. He also seeks a declaratory judgment that Defendants' conduct constitutes illegal deprivation of his due-process rights. Meza finally seeks attorney's fees and costs.

Because the Court determines that the Board did not afford Meza due process in imposing sex-offender conditions as conditions of his parole and such conclusion mandates that he be afforded a new hearing before the Board, the Court need not determine Meza's remaining complaints at this time.

### Analysis

#### Coleman v. Dretke

Meza bases his sex-offender-conditions due-process claim on *Coleman v. Dretke,* 395 F.3d 216, 219 (5th Cir.2004). While Tony Ray Coleman was on parole for a prior offense, a Texas grand jury indicted him for aggravated sexual assault of a child and indecency with a child by contact. *Coleman,* 395 F.3d at 219. Coleman pleaded guilty to and was convicted of only misdemeanor assault, which is not a sex crime. The State revoked his parole for the prior offense, and he was reincarcerated. *Id.* The State eventually released Coleman on parole. *Id.* A condition of Coleman's parole was that he reside at a halfway house until employed. *Id.* A month after the State released Coleman, it imposed two additional conditions on his parole—that he register as a sex offender and that he receive sex-offender therapy. *Id.* Coleman registered as a sex offender but failed to enroll or participate in therapy. The State revoked his parole. *Id.* Coleman petitioned for a writ of habeas corpus, alleging that "the parole panel's imposition of sex offender registration and therapy as conditions to his parole, without providing him the opportunity to contest

tions. Meza has since obtained a driver's license.

his sex offender status, violated his right to due process." *Id.* at 221.[15] The Texas Court of Criminal Appeals denied the petition, as did the federal district court. *Id.* at 219.

The court of appeals determined that Coleman had a liberty interest in not having a sex-offender-therapy condition placed on his parole, because "due to its highly invasive nature, Texas's sex offender therapy program is 'qualitatively different' from other conditions which may attend an inmate's release." *Id.* at 223 (analogizing to *Vitek v. Jones*, 445 U.S. 480, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980)). The court held that the Due Process Clause, as interpreted in *Vitek*, protected Coleman from such stigma, and "the state was required to provide procedural protections before imposing such conditions." *Id.* The State admitted that it had not provided Coleman with process before imposing sex-offender conditions on his parole. Accordingly, the circuit court held that

> [t]he Department may condition Coleman's parole on sex offender registration and therapy only if he is determined to constitute a threat to society by reason of his lack of sexual control. Absent a conviction of a sex offense, the Department must afford him an appropriate hearing and find that he possesses this

offensive characteristic before imposing such conditions.

*Id.* at 225.[16]

### The State's Coleman Review

Following *Coleman,* the State implemented procedures to comply with the State's view of *Coleman*'s mandate. The State's *Coleman* review does not include a hearing. Instead, the Board administratively reviews a parolee's file to determine whether the Board should impose sex-offender conditions. A parolee, such as Meza, who was not convicted of a sex offense, but whose parole conditions included sex-offender conditions before *Coleman,* receives a letter titled "Notice and Opportunity to Respond" from his parole officer, informing the parolee that the prior imposition of the sex-offender condition is under review ("*Coleman* notice"). The *Coleman* notice informs the parolee why the sex-offender condition was imposed and should be continued and offers the parolee 30 days to submit documentation contesting imposition of the condition.[17] A parolee may submit such documentation through his parole officer. Department employees assemble a packet of information, including the parolee's and, if applicable, his attorney's response, the complete parole file, a psychological evaluation of

---

**15.** As a habeas corpus petitioner, Tony Ray Coleman sued Doug Dretke, Director of the Department's Correctional Institutions Division, the state officer with supervision over his incarceration. *Coleman,* 395 F.3d at 219.

**16.** The Department was the only Defendant named in *Coleman,* and the circuit ordered the Department to afford Coleman an appropriate hearing. This Court notes that it is the Board that conducts parole hearings and establishes conditions of parole. The Court considers *Coleman*'s mandate to extend to both the Board and the Department. The Court concludes that *Coleman* requires the State to provide due process that adequately protects a parolee's liberty interest in not

having sex-offender conditions imposed on his parole. Distinctions between Board and Department roles are immaterial for purposes of *Coleman*-required due process.

**17.** The Department's Sex Offender Program Administrative Guidelines delineate *Coleman* review for parolees who have Special Condition X but have not been convicted of a sex crime. However, the Notice and Opportunity to Respond—Sex Offender Special Condition Review (form SP–502) does not expressly mention Special Condition X; instead it refers to imposition of "sex offender treatment special conditions (sex offender treatment and polygraph)".

the parolee, the parolee's polygraph-test results, and a case summary detailing the parolee's social, educational, employment, medical, institutional-adjustment, and behavioral history.

After the Department assembles the packet, a Department Sex Offender Program Specialist or designee presents the packet to a Board panel. Because Department employees perform much of the work before the panel presentation, such presentations typically last between 10 and 30 minutes, depending on the packet's characteristics. The Board panel reviews the items in the packet as well as the parolee's criminal history, police reports, support and protest letters, juvenile record, and the case summary prepared by the parole officer. Department policy dictates that the presenter shall clearly identify the parolee's response for the Board's review. After the Board panel votes on whether to continue the sex-offender-treatment condition, the parole officer is notified of the result, the voted "transmittal" is scanned into the State's Offender Information Management System, and the parolee is notified of the State's decision. The parolee is then referred for treatment if appropriate.

Neither a parolee who receives a *Coleman* notice nor the parolee's attorney is allowed to review the parolee's file or told what information the Board will use in reviewing the condition. Neither the Board nor the Department provides the parolee with his psychological-evaluation, his polygraph results, or a copy of the packet that the Department presents to the Board panel. Neither the parolee nor his attorney may appear before the Board panel. The Board produces no written findings.

Meza argues that *Coleman* requires a hearing at which the State must demonstrate that Meza lacks sexual control. Meza asserts that such a hearing should include written notice, a hearing sufficiently after the notice to allow Meza to prepare, disclosure of evidence being relied upon, an opportunity to be heard in person and to present documentary evidence, an opportunity at the hearing to present witness testimony and to confront and cross examine State witnesses, an independent decision maker, and a written statement by the fact-finder regarding the evidence relied upon and the reasons for the decision. The State argues that *Coleman* does not require a hearing or written findings, that the State's *Coleman* review meets *Coleman*'s requirements, and that Meza was provided adequate due process.

*The Conditions To Which Coleman Applies*

■ The Department argues *Coleman* applies only to the treatment requirement of Special Condition X,[18] not the entire condition. The Court disagrees and concludes that *Coleman*'s due-process requirement applies to any sex-offender condition imposed and thus to all components of Special Condition X. In reaching this conclusion, the Court notes that a parolee's liberty interest in freedom from sex-offender conditions arises not only from the invasive treatment he must undergo, but also from the stigmatizing consequences of being labeled a sex offender. Special Condition X—the "Sex Offender Program" condition—is stigmatizing regardless of its components. *Coleman* recognizes that "prisoners who have not been convicted of a sex offense have a liberty interest created by the Due Process Clause in freedom from sex offender *classification* and condi-

---

**18.** Presumably the Department is referring to the components that read: "I shall participate in the Sex Offender Treatment Program ..." and "[e]nroll in and participate in a treatment program for sex offenders as directed by the supervising parole officer."

tions." *Coleman,* 395 F.3d at 222 (emphasis added); *see also Coleman v. Dretke,* 409 F.3d 665, 668 (5th Cir.2005) (*Coleman II* ) (discussing the stigmatizing effect of sex-offender label). The Court also notes that Department *Coleman* policies refer to Special Condition X generally, not its components.

Meza has not been convicted of a sex crime. He has been convicted of murder. The State does not dispute that *Coleman*'s requirements apply to Meza or that he has a protected liberty interest in freedom from sex-offender conditions. Since 2002, Meza's parole has been conditioned on his compliance with sex-offender conditions, including sex-offender treatment, similar to that at issue in *Coleman.* *Id.* at 223. Meza received and signed a *Coleman* notice on February 23, 2005. Meza's *Coleman* notice informed him that the State conditioned his parole on sex-offender treatment, because a sex-offender-treatment provider indicated Meza should attend such treatment and should not be allowed contact with children. The *Coleman* notice offered Meza 30 days to submit documentation contesting imposition of the condition. Meza did not submit a statement or documentation to contest the conditions.[19]

The Court concludes that *Coleman* applies to any State sex-offender condition imposed on a parolee who has not been convicted of a sex crime.

*What Process is Due?*

■ The requirements of due process are flexible and should be tailored to the situation. *Mathews v. Eldridge,* 424 U.S. 319, 334, 96 S.Ct. 893, 47 L.Ed.2d 18 (1975). To determine the appropriate due

process in a given situation, a court considers:

> [f]irst, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Wilkinson v. Austin,* 545 U.S. 209, 224–25, 125 S.Ct. 2384, 162 L.Ed.2d 174 (2005) (quoting *Mathews,* 424 U.S. at 335, 96 S.Ct. 893).

■ The Court first considers Meza's private interest in freedom from sex-offender conditions. "[B]y requiring Coleman to attend sex offender therapy, the state labeled him a sex offender—a label which strongly implies that Coleman has been convicted of a sex offense and which can undoubtedly cause 'adverse social consequences.'" *Coleman II,* 409 F.3d at 668. The same is true of the State's treatment of Meza. Meza's interest in freedom from sex-offender conditions is significant. Meza's sex-offender status and related stigma have likely contributed to his inability to secure employment. Despite State witnesses' assertions that they would "love" for Meza to find a job, the record also reflects that the State informs Meza's potential employers he is a sex offender. Without employment, Meza cannot form a viable residence plan, leave TCCC, or "be with family and friends and [ ] form the other enduring attachments of normal life." *Morrissey v. Brewer,* 408 U.S. 471, 482, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972).

**19.** Because the Court concludes that the State's *Coleman* review did not comply with the requirements of due process, the Court also concludes that Meza's failure to respond to the State's constitutionally deficient notice does not result in Meza's waiving his objections to the process.

The second *Mathews* factor is the risk of erroneous deprivation of Meza's private interest and the probable value of additional procedural safeguards. Despite the State's notice to Meza, without the State informing him what evidence would be used against him, Meza was unable to prepare an informed response to the State's position. With more complete information Meza could better respond and through adversary hearings could assure that all relevant issues are considered. "[T]he subtleties and nuances" of the expert psychologist and therapist opinions and reports involved in sex-offender determinations justify requiring adversary hearings. *Vitek*, 445 U.S. at 495, 100 S.Ct. 1254. The State's *Coleman* review therefore creates a risk of erroneous deprivation, and additional procedural protections will help prevent such risk.

Under the final *Mathews* factor, the Court considers the State's interests and evaluates the fiscal and administrative burdens that additional procedural safeguards would place on the State. The State's interest in identifying, supervising, and rehabilitating sex offenders is obviously significant, but does not obviate the need to protect Meza's private interest. The State argues it will be financially burdensome to increase procedural protections for offenders whose parole it hopes to condition on sex-offender-conditions.[20] The Court re-jects the State's analysis. Although adding procedures will cause some administrative and financial burden to the State, the Court finds, based on the record before it, that affording additional procedural protections to Meza and others similarly situated would not be a significant burden on the State.

Relying on *Austin*, the State urges the Court to find that the State's current *Coleman* review meets the requirements of due process. *See Austin*, 545 U.S. at 213, 125 S.Ct. 2384. In *Austin*, the Supreme Court found a liberty interest in Ohio prison inmates' freedom from placement in an Ohio "Supermax" prison facility. *Id.* The court held that Ohio's Supermax-assignment procedures complied with due-process requirements. *Id.* The Court finds *Austin* distinguishable from this case.

The procedures at issue in *Austin* provided greater protections than the State's *Coleman* review. Ohio initiates proceedings by providing the inmate with written notice summarizing the conduct or offense triggering the review and access to the detailed form prepared to initiate proceedings. *Id.* at 216, 125 S.Ct. 2384. The inmate may then attend a hearing, present objections to proposed Supermax placement, and submit a written statement. *Id.* After the hearing, if state officials recommend Supermax placement, they document their reasoning in a report that is then

---

**20.** Fox testified that to conduct *Coleman* reviews in the same format as parole-revocation hearings, the Board would need two additional Board members, four additional commissioners, and greater support staff, at an annual cost of approximately $750,000. Janet Latham, a Department Sex Offender Program Specialist, testified that the Department would need additional staff, and more time spent by existing staff, to conduct such hearings and would need legislative help to do so. Latham concluded the Department would need 113 additional full-time employees, including 38 treatment providers, which would cost approximately $477,000 for start-up and training costs, plus $1.5 million for additional treatment providers. The record does not contain the details on which Fox and Latham based these estimates, but the Court is skeptical so many additional employees would be necessary to add elements to extant procedures. The Court notes that the Board may write and implement rules regarding the conduct of a parole or mandatory-supervision hearing and the conditions to be imposed on a parolee. *See* Tex. Govt. Code Ann. § 508.0441(c).

reviewed at two more levels, each of which provides written reasons for its findings if it recommends Supermax placement. *Id.* at 216–17, 125 S.Ct. 2384. The inmate receives a copy of the decision and reasons and has 15 days to file objections, which state officials consider at a final level of review. If state officials finally decide to place the inmate in the Supermax facility, they note the reasons for their decision in a document, which is again provided to the inmate. *Id.* Once an inmate is placed in the Supermax facility, he receives a review 30 days later. *Id.* In comparison, when the State reviewed Meza's sex-offender conditions it did not provide him materials on which to base his response, did not allow him to appear and present evidence at a hearing, produced no written findings, the decision was not subject to any level of review, and the only reason provided for the condition's imposition was "[a] sex offender treatment provider has indicated that you should attend sex offender treatment and should not be allowed contact w/ children." *Compare id.* 216–17, 125 S.Ct. 2384.

Having considered Meza's and the State's interests and the benefit of additional procedures, the Court concludes that the "appropriate hearing" called for by *Coleman* requires more than the State currently provides. *Coleman,* 395 F.3d at 225.

*The Requirements of Due Process for Meza*

■ In the parole-revocation-hearing context, the minimum requirements of due process are: (1) written notice of claimed violations; (2) disclosure of relevant evidence; (3) opportunity for the parolee to appear in person and present witnesses and documentary evidence; (4) the right to confront and cross examine adverse witnesses, unless good cause is shown for not allowing confrontation; (5) an independent

hearing body; and (6) a written statement of the evidence relied upon by the fact-finders in reaching their decision and reasons for reaching their decision. *Morrissey v. Brewer,* 408 U.S. 471, 489, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972).

In *Coleman,* the Fifth Circuit relied on *Vitek v. Jones* in determining that parolees have a liberty interest in freedom from sex-offender treatment. *Coleman,* 395 F.3d at 223; *Coleman II,* 409 F.3d at 668. In *Vitek,* the Supreme Court affirmed a district-court opinion mandating procedural protections that substantially mirrored the Morrissey requirements. 445 U.S. at 494–96, 100 S.Ct. 1254; *see Miller v. Vitek,* 437 F.Supp. 569, 574 (D.Neb.1977). Although *Coleman* did not delineate what procedures are required to protect a parolee's liberty interest in freedom from sex-offender treatment, *Vitek* required parole-revocation-type procedural protections. *See Vitek,* 445 U.S. at 494–95, 100 S.Ct. 1254; *Morrissey,* 408 U.S. at 489, 92 S.Ct. 2593; *Coleman,* 395 F.3d at 223.

The State's *Coleman* review complies with some, but not all, of the *Morrissey–Vitek* requirements. Through *Coleman* review, the State provided Meza with notice that it was reviewing his sex-offender-treatment conditions and allowed him to respond. Additionally, the State provides an independent decision maker in the Board. *See Morrissey,* 408 U.S. at 485–87, 92 S.Ct. 2593 (describing parole officer as person too intimately connected with parolee's case to provide the appropriate decision-making objectivity in parole-revocation hearing, but stating some other administrative officer would be appropriate).

The State did not, however, disclose relevant evidence, give Meza an opportunity to appear in person and present witnesses and documentary evidence, to confront and cross examine adverse witnesses, or produce written findings regarding the evi-

dence it relied on and the reasons for its decision. *Coleman* requires that the State determine Meza constitutes a threat to society by reason of his lack of sexual control. In doing so, it must "afford him an appropriate hearing and find that he possesses this offensive characteristic." *Coleman*, 395 F.3d at 225. The record in this case is utterly devoid of findings regarding Meza. The Court rejects the State's argument that the continued imposition of sex-offender conditions constitutes a sufficient "finding" that Meza possesses the offensive characteristic of lack of sexual control or the basis for such "finding."

■ The Court notes that prison disciplinary proceedings require fewer due-process protections than parole-revocation procedures. At a minimum, however, due process requires that inmates be afforded advance written notice of the claimed violation and a written statement by fact-finders regarding the evidence relied upon and reasons for the disciplinary action taken. *See Wolff v. McDonnell*, 418 U.S. 539, 563, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). The Court sees no reason the State cannot afford Meza at least the procedural protections afforded prison inmates and concludes that the State's *Coleman* findings must be written and specific. *See Vitek*, 445 U.S. at 494–95, 100 S.Ct. 1254; *Wolff*, 418 U.S. at 563, 94 S.Ct. 2963. As to the decision to implement sex-offender conditions, "the provision for a written record helps to insure that administrators, faced with possible scrutiny by state officials and the public, and perhaps even the courts, where fundamental constitutional rights may have been abridged, will act fairly." *Wolff*, 418 U.S. at 565, 94 S.Ct. 2963.

Disclosure of the evidence that will be relied upon and opportunity to be heard in person and present documentary evidence have been called "so fundamental that little discussion of them is needed." *Miller*,

437 F.Supp. at 574, *aff'd Vitek*, 445 U.S. at 495–96, 100 S.Ct. 1254. Regarding the evidence the State will rely upon, Department Sex Offender Program Specialist Janet Latham testified that although the State does not currently provide offenders with their psychological evaluations and polygraph-test results, there is no policy against providing them. The Court sees no reason the State cannot provide the evidence supporting its position to Meza so he may prepare an informed response to such evidence. The State need not provide Meza with his entire parole file, but must allow him access to the information that the State will use in deciding whether to continue to impose sex-offender conditions. Likewise, in the interest of safety, the State may reasonably redact identifying information.

Meza and his attorney must be allowed to appear in person at a hearing at which the State considers whether to continue imposing sex-offender conditions. At such a hearing, Meza must, at a minimum, be afforded an opportunity to be heard and present documentary evidence. He must also be able to call witnesses "when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals." *Wolff*, 418 U.S. at 566, 94 S.Ct. 2963.

Whether Meza should be able to confront and cross examine State witnesses is a slightly different question, and here the Court finds *Vitek* and *Miller* persuasive. *See Vitek*, 445 U.S. at 496, 100 S.Ct. 1254; *Miller*, 437 F.Supp. at 574 ("the nature of the inquiry in a mental hearing holds a sufficiently low possibility of friction that it appears to us there is a right to call witnesses and confront and cross-examine witnesses...."). Here, the question whether the State may continue to impose sex-offender conditions will most likely not implicate concerns for inmates' or other

parolees' safety or outweigh the benefits of allowing confrontation and cross examination. *Compare Wolff*, 418 U.S. at 567–69, 94 S.Ct. 2963 (describing potential for prison disruption if inmates facing discipline could confront and cross examine adverse witnesses). An appropriate hearing must therefore include Meza's opportunity to call witnesses and confront and cross examine adverse witnesses, "except upon a finding, not arbitrarily made, of good cause for not permitting each as to a particular witness." *Miller*, 437 F.Supp. at 574, *aff'd Vitek*, 445 U.S. at 496, 100 S.Ct. 1254 ("The interests of the State in avoiding disruption was recognized [by the district court] by limiting in appropriate circumstances the prisoner's right to call witnesses, to confront and cross examine.").

In summary, this Court concludes that due process requires that the State afford Meza an appropriate hearing, including: (1) written notice in advance of the hearing; (2) disclosure of the evidence on which the State is relying; (3) a hearing, scheduled sufficiently after the notice to permit Meza to prepare, at which he will have the opportunity to be heard in person, represented by counsel, and to present documentary evidence in his support; (4) an opportunity at the hearing to call witnesses and confront and cross examine State witnesses, "except upon a finding, not arbitrarily made, of good cause for not permitting each as to a particular witness"; (5) an independent decision maker; and (6) a written statement by the fact-finder as to the evidence relied upon and the reasons for the decision. *Miller*, 437 F.Supp. at 574. The State must afford Meza effective and timely notice of all these rights. The State may only continue to impose sex-offender conditions on Meza's parole if,

through these procedures, it determines that he "constitute[s] a threat to society by reason of his lack of sexual control." *Coleman*, 395 F.3d at 225.

The State has failed to provide Meza this level of process.

### *Meza's Remaining Due–Process and Equal–Protection Claims*

Meza also argues he has a liberty interest in freedom from certain of his other conditions and their components, specifically Special Condition 0.99 (parole-officer-escort condition), O.06 (child-safety-zone condition), other child-safety-zone components (within SISP and Special Condition X), and the requirement that he live at TCCC. Meza argues the State violates his equal-protection rights by subjecting him to intentional, irrational treatment.

The Court notes that the record reflects that the State has managed to keep Meza incarcerated since 2002, despite the fact that he is on parole and should be able to use this time to readjust to society before his sentence expires in 2017. The Court has received and considered the Declaration of Linda Scavella, which establishes that even after the trial in this case, the Department resists allowing Meza to live beyond the jail, although housing options exist that comply with Meza's conditions.[21] Such evidence, when considered with the record as a whole, causes the Court to question the sincerity of all assertions by the State that it desires Meza to find a job, create a viable residence plan, or live in the community.

Regardless of the State's protestations to the contrary, Meza has remained incarcerated since his mandatory supervision

---

**21.** On December 23, 2008, Meza filed his Opposed Motion to Supplement the Record (Clerk's Document 351), seeking to supplement the record with the Declaration of Linda

Scavella. The State filed no response, and the Court hereby **GRANTS** the motion to supplement as unopposed. *See* Loc. R. W.D. Tex. CV–7(d).

began in 2002. No reasonable observer may conclude otherwise. To cite but one example, the conditions of Meza's parole, as decreed by the Board, do not restrict his time outside of TCCC. The Board has compelled, however, that Meza always be accompanied by a probation officer. The Department has determined, on its own, to restrict Meza's time outside of TCCC to eight hours per week and has determined the number of hours Meza may spend at Project Rio and even the days on which he may visit Project Rio. The Court finds that the Department, through this action alone, is inhibiting or preventing Meza's securing employment. Without employment, Meza may not develop a viable residence plan that would allow him to leave TCCC. Thus, under the State's current practice, he will remain incarcerated in TCCC until the expiration of his sentence in 2017, then be released into society, having received none of the presumed benefits of gradual reassimilation.

Because the Court has concluded that *Coleman*'s "appropriate hearing" mandate requires more robust procedural protections than the State's current *Coleman* review, the Court does not today reach these remaining claims and will dismiss them without prejudice. The Court is certain that the State will use the hearing and review process ordered today to reevaluate all of Meza's parole conditions and restrictions on his freedom, whether ordered by the Board or instituted by the Department, and consider such reasonable changes as will enhance Meza's opportunity to safely reintegrate into society.

*Conclusion*

In light of the foregoing, the Court renders the following declaration, injunction, and orders:

**THE COURT DECLARES** that the State failed to afford Meza "a hearing meeting the requirements of due process" when it imposed sex-offender conditions on his parole. *Coleman*, 395 F.3d at 225.

Accordingly, **IT IS ORDERED** that the State shall provide Meza with an appropriate hearing regarding imposition of sex-offender conditions on his parole consistent with the Court's findings and conclusions set forth herein.

**IT IS FURTHER ORDERED** that Meza's equal-protection and due-process claims regarding his other formal and informal conditions of parole are **DISMISSED WITHOUT PREJUDICE.**

**IT IS FURTHER ORDERED** that Meza is awarded costs for the prosecution of this cause. Meza's request for attorney's fees is **DISMISSED WITHOUT PREJUDICE** to refiling in accordance with the Local Rule CV–7(i) of the Local Rules of the Western District of Texas.

**IT IS FINALLY ORDERED** that Defendants Livingston and Collier's Motion for Summary Judgment with Brief in Support filed March 14, 2007 (Clerk's Document 109), Plaintiff's Motion for Partial Summary Judgment filed March 14, 2007 (Clerk's Document 112), Plaintiff's Motion for Summary Judgment filed July 17, 2008 (Clerk's Document 277), and [The Board's] Motion for Summary Judgment filed August 4, 2008 (Clerk's Document 279) are **DISMISSED.**