IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






NO. AP- 76,445






EX PARTE JOHNATHAN EVANS, Applicant






ON APPLICATION FOR A WRIT OF HABEAS CORPUS


CAUSE NO. B-01-0239-S IN THE 119TH DISTRICT COURT


FROM TOM GREEN COUNTY





 Cochran, J., delivered the opinion of the Court in which Meyers, Price,
Johnson, Keasler and Hervey, JJ., joined. Keller, P.J., filed a concurring
opinion. Womack, J., concurred.

 

O P I N I O N 



 In his application for a writ of habeas corpus, applicant contends that the Texas
Department of Criminal Justice-Parole Division (TDCJ) improperly and without due process
placed "Special Condition X" (sex-offender conditions) on him after he had been released
on mandatory-supervision parole. Based on the evidence in the record before him, the habeas 
judge entered findings that applicant had not been convicted of a sex offense and that his
conviction for Injury to a Child did not involve evidence of sexual abuse. The habeas judge
further found that applicant was not afforded constitutional due process before the sex-
offender conditions were imposed. The judge recommended that this Court grant relief. 
Because the record supports the trial judge's findings and his recommendation, we grant
applicant relief.

I.


 The judge of the convicting court is the original factfinder in post-conviction habeas
corpus proceedings. Thus, this Court gives great deference to the convicting court's findings
of fact, conclusions of law, and recommendations, as long as they are supported by the
record. (1) We consider the evidence and factual conclusions that may be implied from the
evidence in the light most favorable to the habeas judge's findings, (2) and we will afford
almost complete deference to the habeas court's determination of historical facts if they are
supported by the record. (3) Because the convicting court entered factual findings favorable to
the applicant and recommended that this Court grant relief, we set out the facts in the light
most favorable to the convicting court's recommendation.

 On October 29, 2001, applicant pled guilty to two counts of reckless injury to a child
involving his two baby girls, Jasmine and Jade Evans. According to the prosecutor who
handled the case, at no time "did [he] ever view the case as a sex crime, nor did [he] see
anything in the case to indicate any sexual intent or conduct which concerned me." (4) 
Similarly, the trial judge who presided over the plea stated, "Based upon the trial court's
personal recollection of the facts adduced at Applicant's trial, there was no evidence of
sexual abuse of Applicant's victims." Both of applicant's two-month-old daughters suffered
serious physical injuries while in applicant's care.

 Applicant was sentenced to ten years in prison on each count. According to TDCJ
records, he was "released to parole" (5) in Lubbock on October 25, 2006, where he lived with
his uncle. He was released with SISP conditions (6) and was not allowed to see his children
until he took anger-management and parenting classes. Applicant was so successful on
parole that-at the seventeenth-month mark-he was removed from all SISP conditions. 
Because he was then allowed to see his children, he asked to transfer his parole to El Paso
so that he could be closer to his daughters. He wanted to become a nutritionist and registered
for classes at the El Paso Community College. 

 But once applicant arrived in El Paso, his new parole officer gave him a "Notice and
Opportunity to Respond Pre-Imposition of Sex Offender Special Conditions." That notice,
dated April 16, 2008, stated, 

 The file material indicates the offender had been caring for two month old twin
daughters. The children were taken to the hospital with broken legs, skull
fracture, and bruising on the buttocks. Bright red spots were also found in the
vaginas of both victims. The offender claimed he may have wiped them too
hard causing the bleeding. He also stated when changing their diapers he
would insert his finger in their vaginas in order to be sure there was no feces
in their vaginas. He also said he would [pinch] their butts to play with them
and this was how the bruising occurred. (7)


Applicant submitted a written response, stating that he was unable to obtain the court records
from his daughters' pediatrician that clarified that there were no bruises on the daughters'
buttocks; the markings were "strawberry patches" which are frequently found on African and
Asian babies. Applicant also stated that the girls' doctor explained in court that the bright
red spots on their vaginas were diaper rash because applicant did not clean them sufficiently
when changing their diapers. Applicant also clarified that he did not clean his daughters'
private parts with his bare finger, but rather with a baby wipe. He stated that the statements
written by the El Paso parole officer have been "mistakenly opinionated." (8) 

 Nonetheless, applicant's El Paso parole officer recommended that the Board panel
impose "Special Condition X"-the Sex-Offender Program. Her transmittal also includes a
statement that applicant "was deceptive" during a polygraph examination (9) and that he
underwent a psychological evaluation with a "Bill Magee" who recommended that applicant
participate in sex-offender counseling. (10) Three days later, on June 13, 2008, the Board panel
imposed "Special Condition X."

 These sex-offender conditions included, inter alia: 


 Enroll in and participate in a treatment program for sex offenders;


 


 Not communicate directly or indirectly with the victims of "the sex offense";


 


 Not participate in any volunteer activities without prior written approval of the
parole officer;


 


 Not enroll in or attend any institution of higher learning, including a
community college, without prior Board approval and notification to the
victims of "the sex offense";


 


 Not view, possess, purchase, or subscribe to any photographs, literature,
magazines, books or visual media that depict sexually explicit images;


 

 

 Submit to polygraph examinations as approved by the parole officer and
Board;

 Not attend any program that includes participants who are 17 years of age or
younger or go within 500 feet of anywhere that children commonly gather,
including schools, day care facilities, playgrounds, public swimming pools; 


 


 Not become involved in dating, marriage or platonic relationships with anyone
who has children 17 years old or younger without written approval by the
parole officer;


 


 Not reside with, have unsupervised contact with, or cause to be contacted, any
child 17 years or younger in person, by telephone, correspondence, video or
audio device, unless the offender is the legally recognized parent of the child;


 


 Not own, maintain or operate computer equipment without written
authorization from the parole officer;


 


 Not own, maintain, or operate photographic equipment, including still photos,
videos, or any electronic imaging equipment unless approved in writing by the
parole officer; and


 


 Submit to a search of the person, motor vehicle, place of residence, and
property, without a warrant at any time, day or night.



 Immediately after these sex-offender conditions were imposed, applicant went
downhill. He lost his job as a tile-installer because he could not drive to work without going
through child-safety zones. He did not dare visit his two daughters because he did not have
the parole officer's written approval. He became stressed and anxious because he could not
resume his college work, (11) and he could not use a computer, internet, camera, or film. He
developed headaches, irregular bowel movements, fatigue, and nausea. His sleep was poor
and his appetite low. He lost fifteen pounds in six months. He told Dr. Quijano that if
"Special Condition X" were not removed, he would put himself back in prison so that he
would not be on parole. 

 On October 16, 2008, applicant's parole officer, along with five other parole officers,
came to his home and searched it. One officer found a cell phone on applicant's bed that had
a picture of a nude woman on it. Several other pictures of nude women were found in his
cell phone online photo album. The six parole officers found various items in a black
footlocker, including two pornographic DVDs and two disposable cameras with undeveloped
film. The parole officers also found a Bowie knife in a shoe box.

 Four days later, applicant was given notice of a motion to revoke parole, in which the
parole officer alleged nine violations, all based upon the results of the search, and all but one
of which involved violations of "Special Condition X." Applicant's pro bono attorney filed
a Motion to Dismiss Alleged Violations of Conditions of Mandatory Supervision Relating
to Special Condition X. He argued that the conditions had been unconstitutionally imposed
without due process and that the facts of applicant's conviction did not justify such sex-offender conditions. The revocation hearing was held on November 5, 2008. 

 Applicant's father, stepbrother, stepmother, employer, and uncle all appeared and
testified on his behalf. Applicant testified that he had had his cell phone since 2007 when
he was in Lubbock and that the parole officer knew about it and had expressed no concern
about it. Joseph Galarza, applicant's stepbrother, testified that the disposable cameras were
his and the pictures were of him and his family. Roxanne Evans testified that she owns the
home that applicant had been living in. She said that the black footlocker belonged to her
deceased son, Greg, and it contained letters written to her other son, Christopher, as well as
the two pornographic DVDs, and the cameras and photographs owned by Joseph Galarza.

 Nonetheless, the hearing officer found that applicant had violated the sex-offender
conditions by his (1) possession of several photographs on his cell phone depicting sexually
explicit images; (2) possession of the two pornographic DVDs found in the footlocker; (3)
possession of homemade, sexually explicit videos on his cell phone; (4) use of the internet
on his cell phone to send and receive sexually explicit images; and (5) possession of a cell
phone with still picture and video capability. The hearing officer found that the other
allegations, including the sole non-sex-offender violation, were not proven.

 Applicant's attorney filed a Motion to Reopen Revocation Hearing, once again
arguing that "Special Condition X" was imposed on applicant without due process of law and
without a factual basis. He noted that "the basis to put Applicant on special condition X was
three sentences in hundreds (100s) of pages of material related to Applicant's injury to a
child offense." And the parole officer had taken those sentences out of context. 

 Applicant's parole was revoked, and he was returned to prison. Eighteen months
later, applicant filed his application for a writ of habeas corpus in the convicting court. 
Based upon the evidence in the record, the trial judge made the following findings:

 1. Applicant was not convicted of a sex offense. He was convicted of two counts
of injury to a child.


 2. Based upon the trial court's personal recollection of the facts adduced at
Applicant's trial, there was no evidence of sexual abuse of Applicant's
victims.

 . . .


 5. The State imposed Special Condition "X," and thereafter Applicant's parole
was revoked for violation of Special Condition "X."


 6. The Trial Court finds that Applicant was not afforded due process before the
imposition of sex offender conditions.


II.


 In concluding that applicant was not afforded due process before the imposition of
sex-offender conditions, the trial judge relied on the federal district court's reasoning in Meza
v. Livingston. (12) In that case, as in the present one, the Texas inmate was released from prison
on mandatory supervision parole. (13) Meza pled guilty to murder of a nine-year-old girl in
1982. (14) Meza, like applicant, was originally released without any sex-offender conditions
attached to his parole. "Meza lived a relatively normal life within the community," but after
approximately fifteen months on parole, he returned "to his residence 15 minutes after his
state-imposed curfew." (15) His parole was revoked, and he returned to prison for eight more
years. When Meza was again released in 2002, the Board imposed numerous special
conditions on him, including "Special Condition X." (16) Meza eventually filed a federal
lawsuit, alleging that the Board did not afford him due process in imposing sex-offender
conditions as a condition of parole. (17)

 Both the federal district court and the Fifth Circuit Court of Appeals agreed with
Meza. The Fifth Circuit's opinion is particularly important because it clarified exactly how
much process is constitutionally due before sex-offender conditions may be imposed upon
a parolee who has not been convicted of a sex offense. (18) The court reiterated the holding
from its 2004 case, Coleman v. Dretke, (19) that a person's "parole may only be conditioned on
sex-offender registration and therapy if the defendant is 'afforded a hearing meeting the
requirements of due process[.]'" (20) At that hearing, the Board must determine that the parolee
"'constitute[s] a threat to society by reason of his lack of sexual control'" before it may
impose such conditions. (21) But the Fifth Circuit's opinion in Coleman did not fully set out
the constitutional procedures and protections that are required before the Board may impose
sex-offender requirements on a parolee who had not been convicted of a sex offense. In
Meza, the Fifth Circuit had determined that the minimal due-process procedures adopted by
TDCJ after Coleman were not sufficient to protect the parolee's interest "in being free from
the stigma of registering as a sex offender and avoiding highly invasive sex offender therapy"
as well as "the likelihood of erroneous decision-making." (22) 

 Accordingly, the Fifth Circuit, after discussing four Supreme Court decisions, (23) held
that "a parolee who has not been convicted of a sex offense" (24) must be afforded the following
procedures before sex-offender conditions may be imposed upon him:

 (1) written notice that sex offender conditions may be imposed as a condition of
mandatory supervision;


 (2) disclosure of the evidence being presented against [the person] to enable him
to marshal the facts asserted against him and prepare a defense;


 (3) a hearing in which [the person] is permitted to be heard in person, present
documentary evidence, and call witnesses;


 (4) the right to confront and cross-examine witnesses, unless good cause is shown;

 

 (5) an impartial decision maker;


 (6) a written statement by the factfinder as to the evidence relied on and the
reasons it attached sex offender conditions to his mandatory supervision. (25)


The only difference in the reasoning and result reached by the federal district judge and the
Fifth Circuit was that the latter held that the State was not required to provide the parolee
with counsel for purposes of the evidentiary hearing. (26)

 The same minimal due-process procedures found wanting in Meza were used in
applicant's case. The habeas judge in the present case relied upon the specific holding in
Meza and also found the following:

 The procedural history of Meza [is] very similar to this case. Applicant in this
case was not convicted of a sex offense. The State gave notice of intent to
impose sex offender conditions-Special Condition "X," but Applicant was not
allowed to appear at the hearing, present his own witnesses, nor confront or
cross-examine the State's witnesses.


It would certainly seem that the procedural posture in Meza is similar to that in this case. (27)
According to the habeas judge, applicant is entitled to the relief that he seeks: immediate
release on mandatory supervision without sex-offender conditions, and, if TDCJ seeks to re-impose such conditions, the protection of the Meza due-process procedure. But we filed and
set this case to invite a response from TDCJ. It has responded and we shall address its
arguments.

III.


 TDCJ, acting through the Office of the Attorney General, makes four general
arguments. First, applicant has received all of the due process he was entitled to under Ex
parte Campbell. (28) Second, the Fifth Circuit's holding in Meza (29) should not be extended to
applicant. Third, applicant's due-process rights were not violated because he was revoked
for violations unrelated to sex-offender treatment and registration. Fourth, and in the
alternative, TDCJ requests an evidentiary hearing in the trial court on the costs of
implementing Meza. We shall address each argument in turn, beginning with the first two.



A. Our decision in Ex parte Campbell followed much of the Fifth Circuit's reasoning 
in Coleman. Now that the Fifth Circuit has clarified Coleman, we shall clarify
Ex parte Campbell. 


 In its first two arguments, TDCJ claims that the due-process rights set out in Meza
apply only to those inmates who were released on mandatory supervision under the pre-1996
law because Mr. Meza himself was released under the pre-1996 law. Now that release on
mandatory supervision is discretionary, TDCJ argues, inmates who are released under
"discretionary" mandatory supervision are not entitled to due process before the imposition
of "Special Condition X." (30) For those releasees, the minimal due-process right to notice and
an opportunity to respond set out in our prior decision in Ex parte Campbell suffices.

 If logic is any guide, this is exactly backwards. Before the enactment of
"discretionary" mandatory supervision, all inmates whose good time plus actual time in
prison equaled the total length of their sentence were absolutely required to be released on
parole. (31) The Parole Board had no discretion to deny release to an inmate even if the Board
was certain he would pose a clear and present danger to society. (32) Indeed, Mr. Meza was the
"poster child" for the need to enact the 1995 statute (33) that gave the parole board some
discretion in denying mandatory supervision release under certain, specific circumstances. (34) 
Under current law, the Board may deny release to an inmate, who is otherwise eligible for
release on mandatory supervision, if it finds that (1) the inmate's accrued good conduct time
is not an accurate reflection of the inmate's potential for rehabilitation, and (2) the inmate's
release would endanger the public. (35) Similarly, a parole panel may impose "Special
Condition X" upon a parolee only if it determines that the parolee "constitute[s] a threat to
society by reason of his lack of sexual control." (36) 

 Thus, under the current law, if an inmate poses a threat to society-sexual or
otherwise-the Board has the discretion not to release him on mandatory supervision at all, 
as long as it sets out the specific reasons for that discretionary decision. Of course, as we
stated in Ex parte Geiken, (37) an inmate does have a protectable liberty interest in release on
mandatory supervision because the statute provides that an inmate "shall" be released absent
Board action to the contrary. (38) Thus, an inmate must be given timely notice that he will be
considered for release on (discretionary) mandatory supervision and an opportunity to tender
to the Board information on his behalf in support of release. (39) Notice and an opportunity to
be heard is sufficient due process in that situation. As TDCJ correctly notes, in citing Malchi
v. Thaler, (40) the lowest level of due process (notice and an opportunity to respond) may be
appropriate in the decision to release an inmate on discretionary mandatory supervision
because that decision is not a "highly invasive" or "stigmatizing" one, such as the imposition
of "Special Condition X." (41) 

 But applicant was released on mandatory supervision because the Board did not find
that he posed a threat to society. He was released with SISP conditions, but without "Special
Condition X." He abided by his SISP conditions and was released from them after successful
completion of parenting and anger-management classes. It was only after he had been a
successful parolee for eighteen months that his new El Paso parole officer set in motion the
procedure to impose sex-offender conditions on him. 

 It would certainly seem logical that a person who has already been released from
prison because he did not constitute a threat to society is entitled to more due process
protection from imposition of sex-offender conditions than a person who, like Meza, was
required to be released from prison regardless of how grave a threat he might pose to society. 
Indeed, the Fifth Circuit's opinion in Meza stated that "if Meza were an inmate instead of a
parolee, the Wolff standard [the same due-process standard that the Meza court adopted]
would likely apply" to the decision to treat him as a sex offender. (42) If an inmate is entitled
to those due-process protections, surely a parolee who had already been discretionarily
released because he did not pose a danger to society is entitled to those protections. As the
Fifth Circuit stated, "Because fewer security concerns are at issue and the liberty deprivations
are more immediate and certain, the [Supreme] Court generally finds that parolees are owed
more process than inmates." (43) Nor is there any hint or suggestion in the Meza opinion that
its reasoning or result should logically apply to those who are required to be released under
the pre-1996 amendments, but not to parolees or those released on discretionary mandatory
supervision. The liberty interest of all three groups is the same, (44) and the risk of an erroneous
decision is the same.

 TDCJ argues that the bare-bones due-process procedure of notice and an opportunity
to respond that we set out in our decision in Ex parte Campbell-a case dealing with the
imposition of sex-offender conditions on a releasee who had a prior sex-offense conviction
of some type-also suffices for those released on discretionary mandatory supervision who
have no prior sex-offense convictions. (45) But as the concurrence in Ex parte Campbell
explicitly noted, we adopted this "minimal" due-process standard because Coleman "did not
elaborate on precisely what type of notice and hearing would suffice to support a parole
board's finding that a parolee would 'constitute a threat to society by reason of his lack of
sexual control.'" (46) Now that the Fifth Circuit has elaborated on the specific type of notice and
hearing that is required in this situation, we shall once again follow its lead, not because we
must do so, but because the reasoning of the Fifth Circuit is persuasive and is consistent with
that of several other circuit courts. (47)

B. Applicant was revoked only for violations related to "Special Condition X."

 As its third argument for why applicant should not obtain relief, TDCJ argues that
applicant's parole was not revoked specifically for violations of "sex-offender treatment."
True enough, but applicant was revoked because of the violation of conditions contained in
"Special Condition X." And, as applicant argues, none of those sex-offender conditions
should have been imposed on him without the due-process procedures required by Meza. 
TDCJ relies on the Fifth Circuit's decision in Williams v. Ballard, (48) in which the court agreed
that the parolee was entitled to due process under Coleman before he could be required to
register as a sex offender. The court also noted in passing that the parolee had originally
challenged other conditions that were a part of "Special Condition X," but that he did not
appeal the district court's ruling that only the registration and therapy components raised due-
process concerns. (49) The Fifth Circuit simply noted that it "had no occasion to address other
[sex-offender] conditions" in Coleman. (50) In Meza, however, the Fifth Circuit addressed the
due-process protections required before imposing "sex offender conditions" as a general
matter. We do not read its opinion as dealing solely with one or two of the conditions of
"Special Condition X," but rather the entire panoply of stigmatizing and highly invasive
requirements of "Special Condition X." The Fifth Circuit posed the crucial issue in its first
paragraph: 

 Texas parolee, Raul Meza, who has never been convicted of a sex offense,
sued [the TDCJ defendants] for violations of his right to due process after the
defendants attached sex offender conditions to his mandatory supervision. 
This court has made clear that sex offender conditions may only be imposed on
individuals not convicted of a sex offense after the individual has received due
process. Meza alleges that before sex offender conditions were attached to his
mandatory supervision, inadequate process was provided. Thus, this case
requires us to determine whether the process utilized by the defendants in this
case is constitutionally sufficient. (51)

From this introductory paragraph and the lengthy discussion and constitutional analysis that
follows, we cannot conclude that the Fifth Circuit intended that the due-process requirements 
applied only to one or two of the sex-offender conditions set out in "Special Condition X."

 TDCJ also cites an apparently unreported district court order, Carter v. Thaler, (52) for
the proposition that a person's parole may be revoked for grounds other than a violation of
the "Special Condition X" terms, even though the parolee argues that imposition of sex-offender conditions without due process was improper. Well, of course. If applicant's parole 
had been revoked for possessing an illegal Bowie knife (as was originally alleged, but not
proven), he would have no basis to complain about his revocation. Here, however, all five
of the violations that applicant was found to have committed were conditions imposed by
"Special Condition X." Applicant's parole was revoked solely because of the sex-offender
conditions that were imposed upon him without due process and against which he has
protested at every step of the way.

C. We need not remand for another hearing concerning the fiscal impact of Meza
on TDCJ.

 TDCJ argues here, just as it did in the federal district court and the Fifth Circuit, that
it is too expensive to provide a due-process evidentiary hearing before imposing sex-offender
conditions on those who have never been convicted of a sex offense. TDCJ states that
approximately 33,000 inmates were released last year on parole, mandatory supervision, or
discretionary mandatory supervision. But that number is irrelevant as it includes the entire
cohort of releasees, including DWI felons, drug addicts and dealers, thieves, and all manner
of non-sex offenders. The relevant figure is the number of potential releasees who have not
been convicted of a sex offense, but for whom TDCJ seeks the imposition of "Special
Condition X." And surely that is a very small number indeed because TDCJ may refuse to
release those inmates (subject to discretionary mandatory supervision or parole) who
currently pose a threat-sexual or otherwise-to society. 

 In Meza, the district judge noted that the "State argues that it will be financially
burdensome to increase procedural protections for offenders whose parole it hopes to
condition on sex-offender-conditions." (53) The district judge rejected TDCJ's analysis and
concluded that "affording additional protections to Meza and others similarly situated would
not be a significant burden on the State." (54) Similarly, the Fifth Circuit stated that TDCJ
Board witnesses predicted that there were currently 6,900 prisoners who will potentially need
to receive Coleman notice before their release. (55) But after balancing the additional costs to
TDCJ against the parolee's liberty interest and the likelihood of erroneous decision-making
without appropriate due-process protections, the Fifth Circuit concluded that the present
procedures-the ones used in Meza and in the present case-were unconstitutional. (56)

 Therefore, we agree with the habeas judge in this case that, under Meza, applicant is
entitled to the relief he seeks: immediate reinstatement of his release on mandatory
supervision and removal of "Special Condition X" from the terms of his parole. The
mandate shall issue on this date. A copy of this opinion shall be delivered to TDCJ.


Delivered: May 4, 2011

Publish
1. See Ex parte Van Alstyne, 239 S.W.3d 815, 817 (Tex. Crim. App. 2007); see also Ex
parte Reed, 271 S.W.3d 698, 727 (Tex. Crim. App. 2008) (describing the role of the trial judge
in habeas proceedings as "'the collector of the evidence, the organizer of the materials, the
decisionmaker as to what live testimony may be necessary, the factfinder who resolves disputed
fact issues, the judge who applies the law to the facts, enters specific findings of fact and
conclusions of law, and may make a specific recommendation to grant or deny relief'") (quoting
Ex parte Simpson, 136 S.W.3d 660, 668 (Tex. Crim. App. 2004)).
2. Ex parte Wheeler, 203 S.W.3d 317, 324 (Tex. Crim. App. 2006); see also Ex parte
Simpson, 136 S.W.3d at 668 (noting that this Court's role is to "review the trial court's factual
findings and legal conclusions to ensure that they are supported by the record and are in
accordance with the law.").
3. Ex parte Van Alstyne, 239 S.W.3d at 817.
4. In his letter concerning applicant, the Assistant District Attorney also stated, "Unless
there has been documentation of conduct since the time of his conviction which would indicate
reasons for concern, I cannot see a reason to register this convicted felon as a sex offender."
5. "An inmate released to mandatory supervision is considered to be released on parole." 
Tex. Gov't Code § 508.147(b).
6. "Super Intensive Supervision Program."
7. There is nothing in the record that explains the source of this information, but
presumably it was taken from an underlying offense report and/or medical records. We cannot
assess the reliability or context of this information because there is no back-up document to
substantiate it. Applicant's counsel states that this information was contained in portions of a
very lengthy offense record and medical records, but that it was taken out of context. 
8. Applicant's explanation is consistent with the prosecutor's opinion that applicant's
offense did not involve sexual abuse and with the trial judge's similar conclusion. 
9. The transmittal states that applicant was deceptive when he stated that "he did nothing
wrong" that led to his convictions for injury to a child. But that deception says nothing about
sexual misconduct, as the offense concerned physical misconduct. 
10. Again, there is nothing in the record to show what type of evaluation was involved,
how long it lasted, or the factual basis for "Bill Magee's" conclusion. Applicant said that this
therapist, who had a contractual relationship with the Parole Board, interviewed him for eight
minutes. Applicant's attorney stated that Mr. Magee "had a financial interest in finding that
Applicant met the criteria for special condition X, due to the fact if Applicant was placed on
special condition X, Mr. Magee would provide the treatment classes and receive an income
stream based upon Applicant having imposed on him special condition X." 

 Applicant later submitted a report from Dr. Walter Quijano, a clinical psychologist, who
conducted a clinical interview as well as the Millon Clinical Multiaxial Inventory-III (MCMI-III). 
Applicant tested "in a socially favorable light," but also high for anxiety. He did not appear to
meet the criteria of antisocial personality disorder. Dr. Quijano concluded that "there appears to
be no basis for classifying [applicant] as a sexual offender." His diagnostic impression was that
applicant had "adjustment disorder with anxiety and depressed mood, secondary to imposition of
[Special Condition] X." He also diagnosed adult antisocial behavior based on the offense of
conviction. 
11. Previously, applicant had a 3.5 average in his basic classes at community college.
12. 623 F.Supp.2d 782 (W.D. Tex. 2009), aff'd in part, 607 F.3d 392 (5th Cir. 2010).
13. Id. at 785.
14. Id. at 784.
15. Id. at 785.
16. Id. at 786. 
17. Id. at 789.
18. Meza v. Livingston, 607 F.3d 392, 395 (5th Cir. 2010).
19. 395 F.3d 216 (5th Cir. 2004).
20. Meza, 607 F.3d at 397 (quoting Coleman, 395 F.3d at 225).
21. Id.
22. Id. at 401-03 (concluding that "the current Texas procedures for providing parolees
with their Coleman notice does not meet the constitutional requirements for due process.").
23. The Meza court, like several other federal circuit courts, see note 44 infra, discussed
four Supreme Court procedural due-process decisions that had crafted a spectrum of greater
protections when the "deprivation of the liberty interest leads to stigmatizing and physically-invasive consequences." Id. at 404-08 (discussing Morrissey v. Brewer, 408 U.S. 471 (1972)
(holding that parolees had a liberty interest in avoiding parole revocation and setting out
minimum due-process procedures), Wolff v. McDonnell, 418 U.S. 539 (1974) (holding that
inmates were entitled to due-process protections in prison disciplinary proceedings that could
result in the loss of an inmate's good-time credits), Greenholtz v. Inmates of Neb. Penal & Corr.
Complex, 442 U.S. 1 (1979) (only minimal due-process procedures necessary in making the
discretionary determination of whether to grant parole), and Vitek v. Jones, 445 U.S. 480 (1980)
(except for right to counsel, inmate had full panoply of due-process rights set out in Wolff and
Morrissey when prison officials wanted to transfer him to a mental hospital)). The Meza court
concluded that, "If the deprivation of liberty will cause certain, immediate adverse consequences
to the parolee or prisoner, the Court provides more due process than when the deprivation of
liberty is uncertain and may occur at a later date. Because fewer security concerns are at issue
and the liberty deprivations are more immediate and certain, the Court generally finds that
parolees are owed more process than inmates." Id. at 408 (citations omitted).
24. Id. at 411.
25. Id. at 412.
26. Id. at 411, 413 ("Given the substantial cost to the State to provide counsel to parolees
facing registration and sex therapy and the Supreme Court precedent discussed above, we
conclude that the State is not required to provide counsel to Meza.").
27. Of course we are not bound by Fifth Circuit precedent on federal constitutional issues, Magouirk v. Phillips, 144 F.3d 348, 361 (5th Cir. 1998) (state courts located in the Fifth Circuit
"are not bound by Fifth Circuit precedent when making a determination of federal law").
28. 267 S.W.3d 916 (Tex. Crim. App. 2008).
29. Meza v. Livingston, 607 F.3d 392 (5th Cir. 2010).
30. TDCJ argues, "Because [applicant] was released to discretionary mandatory
supervision, he is not entitled to the additional due process described in Meza, which applies only
to inmates released to mandatory supervision under the pre-1996 statutes." TDCJ Brief at 8. 
TDCJ has attached a short, undated, and apparently unpublished, opinion from the Fifth Circuit
clarifying its prior opinion in Meza, by noting that it addressed the pre-1995 version of the
mandatory release statute, not the amended version which made release on mandatory
supervision discretionary. 
31. See 1977 Tex. Gen. Laws 925 (currently codified, as amended, in Tex. Gov't Code §
508.001, et seq.).
32. See House Comm. Report, Bill Analysis, Tex. H.B. 1433, 74th Leg., R.S. (1995)
(amending then Tex. Code Crim. Proc. art. 42.18, § 8(c) and adding subsection (c-1), now
codified at Tex. Gov't Code § 508.149) (noting that "mandatory supervision has turned into an
automatic open door for prisoners out of the Texas Department of Criminal Justice (TDCJ)
institutional division. Once eligible inmates reach an average of 48% of their total sentence, the
Pardons and Parole Board has no discretion or decision making power regarding their release. . . . 
[T]he purpose of this Act is to give the Pardons and Parole Board a lever to close the 'automatic
open door' of mandatory supervision. . . . Inmates will not be released to mandatory supervision
if the parole panel determines the release of the prisoner would endanger the public."). The
amendment creating "discretionary" mandatory supervision was enacted in 1995, but did not go
into effect until September 1, 1996.
33. See, e.g., Bill Minutaglio, Hating Raul, Dallas Morning News, Jan. 2, 1994 (Dallas
Life), at 6 (lengthy article setting out the history of Meza's murder of Kendra Page, his release on
mandatory supervision, and his movement from El Paso, Witchita Falls, San Antonio, Mineral
Wells, Sweetwater, and Uvalde as each community expressed outrage at his presence on parole);
Plans to Tighten Procedure on Convicts' Early Release Lauded, Dallas Morning News, Sept. 19,
1993, at 23A (citing Raul Meza as an example of how early release on mandatory supervision
provoked outrage in cities where the state has tried to place him); Lori Rodriguez, Citizens Weary
of Criminal Rights, Houston Chronicle, Aug. 21, 1993, at A29 (using saga of Raul Meza as
rationale for more "anti-crime, anti-criminal and pro-law abiding citizens" laws).
34. See generally Ex parte Geiken, 28 S.W.3d 553, 555 (Tex. Crim. App. 2000) (discussing
the 1995 changes to the mandatory supervision statute which became effective Sept. 1, 1996).
35. Tex. Gov't Code § 508.149(b)(2).
36. Coleman v. Dretke, 395 F.3d 216, 225 (5th Cir. 2004) ("The Texas Department of
Criminal Justice is authorized by Texas law to impose reasonable conditions on parole to serve
the interests of protecting the community and rehabilitating the parolee. When those conditions
impact a liberty interest of the parolee, they may be imposed only with justification. The
Department may condition Coleman's parole on sex-offender registration and therapy only if he
is determined to constitute a threat to society by reason of his lack of sexual control. Absent a
conviction of a sex offense, the Department must afford him an appropriate hearing and find that
he possesses this offensive characteristic before imposing such conditions.") (footnote omitted).
37. 28 S.W.3d 553 (Tex. Crim. App. 2000).
38. Id. at 558.
39. Id. at 560.
40. 211 F.3d 953, 958 n.6 (5th Cir. 2000) ("The new Texas Mandatory Supervision law
adds a dimension of discretion to the Mandatory Supervision scheme, providing that if a parole
panel determines that the inmate's accrued good conduct time is not an accurate reflection of the
inmate's potential for rehabilitation and the inmate's release would endanger the public, he may
not be released to mandatory supervision.").
41. See Coleman, 395 F.3d at 223-25.
42. Meza v. Livingston, 607 F.3d at 409. The Fifth Circuit stated that "Meza can claim at
least the same process of an inmate, but as a parolee, he should generally be entitled to more
favorable treatment than inmates." Id. The court also noted that "the Board already provides
parolees with written notice that sex-offender conditions may be imposed as a condition of
parole. Similarly, the decision to impose sex-offender conditions is currently made by the Board,
an impartial decision maker. The other requirements listed here, however, are not currently part
of the Board's procedures." Id. n.14. The Fifth Circuit's message appears to be that its due-process procedural requirements set out in Meza apply to all inmates who might be paroled or
released on mandatory supervision.
43. Id. at 408.
44. As the Fifth Circuit stated in Coleman, "We can hardly conceive of a state's action
bearing more 'stigmatizing consequences' than the labeling of a prison inmate as a sex offender." 
395 F.3d at 223 n.27 (internal quotation marks and citation omitted). Several other federal
circuits have held the same in requiring due-process procedural protections and evidentiary
hearings before labeling either an inmate or releasee a "sex offender" and imposing special
conditions upon him as a result. See, e.g., Renchenski v. Williams, 622 F.3d 315, 326-31 (3d Cir.
2010) (holding that only after due process has been afforded may sex-offender conditions be
imposed on an inmate who has not been convicted of a sexual offense because "[i]t is largely
without question-and Defendants do not claim otherwise-that the sex-offender label severely
stigmatizes an individual, and that a prisoner labeled as a sex offender faces unique challenges in
the prison environment"; setting out Meza-like due-process procedures that must be afforded the
prison inmate prior to such labeling); Kirby v. Siegelman, 195 F.3d 1285, 1292 (11th Cir. 1999)
(Due Process Clause gave rise to an independent liberty interest in not being labeled a sex
offender; "[a]n inmate who has never been convicted of a sex crime is entitled to due process
before the state declares him to be a sex offender."); Neal v. Shimoda, 131 F.3d 818, 831 (9th
Cir. 1997) (before an inmate who has never been convicted of a sex offense may be labeled as a
"sex offender," he "is entitled to the procedural protections outlined by the Supreme Court in
Wolff [v. McDonnell, 418 U.S. 539 (1974)]").
45. In Campbell, the inmate had a prior conviction for indecent exposure. 267 S.W.3d at
918, 921-23.
46. 267 S.W.3d at 933 n.6 (Cochran, J., concurring).
47. See note 44 supra.
48. 466 F.3d 330 (5th Cir. 2006).
49. Id. at 332 n.2.
50. Id.
51. Meza, 607 F.3d at 395 (internal citation to Coleman omitted; emphasis added).
52. No. A-10-CA-065-LY (W.D. Tex. Jan. 6, 2011) (not designated for publication).
53. 623 F.Supp.2d at 793. 
54. Id. In a note, the district judge cited the additional staff and costs that TDCJ testified
would be incurred by providing due process, but expressed skepticism that "so many additional
employees would be necessary to add elements to extant procedures." Id. at 793 n.20.
55. 607 F.3d at 403.
56. Id. The court explained that

 The grave risk of error that envelops the procedures used by the Board is most
troubling. By not allowing the parolee to review the evidence presented against
him, he is unable to correct any misinformation placed in his packet that the Board
reviews. By not allowing the parolee to appear before the Board, the Board must
act without mitigating or clarifying evidence from the parolee. By not allowing the
parolee to confront opposing witnesses, the parolee is unable to refute damning
statements made against his interest and the Board is unable to evaluate the
credibility of the parolee against that of opposing witnesses.

Id. Indeed, that is precisely what applicant asserts in the present case. If the original trial
prosecutor and judge can be credited, TDCJ made an inaccurate decision in concluding that
applicant was a sex offender, and it made that decision because applicant was not allowed to see
the evidence against him, call witnesses, cross-examine the witnesses against him, and have a
neutral factfinder enter specific findings based on the evidence. This case is a good example of
why the procedural protections adopted in Meza are essential to enhance the accuracy of a
decision as to whether a person who has not been convicted of a sex offense is, nonetheless, a
sex-offender who should be subjected to the invasive and stigmatizing "Special Condition X."